UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA CHAVEZ,<br><br>   Plaintiff,<br><br>   v.<br><br>CITY OF HAYWARD, et al.,<br><br>   Defendants. | Case No. 14-cv-00470-DMR<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 65 |

Plaintiff Joshua Chavez filed a civil rights action under 42 U.S.C. § 1983 and state law claiming that he suffered constitutional violations committed by the City of Hayward ("the City"), Hayward Police Chief Diane Urban, current Hayward Police Department ("HPD") Officers Manuel Troche and Michael Miller, and former HPD Officer Richard McLeod (collectively, the "Defendant Officers") in connection with Plaintiff's January 2013 arrest. Defendants now move for summary judgment. [Docket No. 65.] The court conducted a hearing on June 11, 2015. For the following reasons, Defendants' motion is granted in part and denied in part.

**I. Background**

**A.    Factual Background[1]**

On January 19, 2013, at 3:36 a.m., HPD received a 911 call from a woman reporting that she could hear a couple struggling and fighting in the apartment directly above hers, and that she heard a woman crying and saying "get off of me." (Brick Decl., May 6, 2015, Ex. 14 (911 Recordings).) HPD dispatched officers to the scene for a possible "415D," referring to a

---

[1] The parties did not submit a joint statement of undisputed facts. In recounting this statement of facts, the court will indicate any factual disputes in the opinion. In addition, Defendants object to the May 20, 2015 declaration of police expert Roger Clark on the grounds that it lacks foundation and is unreliable. (Defs.' Reply 6-7.) The court denies the objection as moot as it does not consider the Clark declaration in reaching its decision.

1   disturbance of the peace involving a domestic dispute.  The neighbor called 911 again seven
2   minutes later, reporting that she could still hear crying and sounds of a struggle.  In response to the
3   dispatch, Defendants Troche, Miller, and McLeod traveled to the apartment complex at 50 Austin
4   Avenue in Hayward, California.  It is not clear if any of the responding officers heard the second
5   report of an ongoing struggle.

6         The officers made their way to apartment 938, where Plaintiff resided with his then-
7   girlfriend, Alexandra Apfeltzweig.  The officers' descriptions of what they observed upon arrival
8   vary somewhat.  Troche took the lead, and heard a woman whimpering and crying when he
9   arrived on the walkway in front of the apartment.  Troche did not observe any shaking walls or
10  windows. While listening outside the unit, Troche heard "the sound of distress," and "what
11  sounded like a struggle inside and a yelling – a female like screaming for help," although he did
12  not hear the word "help."  (Troche Dep. 62, 65.)  He also heard a male voice, but could not make
13  out the words.

14        McLeod followed Troche.  According to McLeod, he heard screaming and the sounds of a
15  physical altercation in the apartment as he climbed the stairs.  Specifically, he heard "things being
16  slammed down . . . loud thumping and . . . people yelling at each other."  (McLeod Dep. 25.)

17        Miller came last.  He testified that he heard a woman's voice from inside the unit when he
18  was walking from the parking lot to the unit.  He stated that the officers agreed that "there was a
19  female screaming" and that they were trying to locate the apartment.  (Miller Dep. 55.)  Once the
20  officers were standing outside the apartment, Miller heard a woman screaming and crying inside,
21  but he could not make out her words.  He testified that he "kept hearing things getting slammed
22  around," and that he could see the glass in the window vibrate.  (Miller Dep. 56.)  Based on the
23  sounds of the woman screaming, and "the way the glass window was moving . . . like something
24  was getting slammed against the wall," Miller thought it sounded like there was "some type of
25  struggle going on inside the apartment," and he believed that there was a "victim of domestic
26  violence inside the apartment unit."  (Miller Dep. 59.)

27        Plaintiff and Apfeltzweig describe the events in their apartment differently.  Apfeltzweig
28  had gone out with friends for dinner and dancing.  Plaintiff remained at home and was awake

when Apfeltzweig returned after 3:00 a.m.  Upon her return, Plaintiff and Apfeltzweig started arguing and at some point the argument turned physical.  Apfeltzweig raised her voice and was yelling at Plaintiff, and according to Apfeltzweig, Chavez tried to give her a hug to comfort her, which made her get louder.  At some point, according to Apfeltzweig, Plaintiff put his hand over her mouth "to try to hold [her] down" and "quiet" her.  (Apfeltzweig Dep. 91.)  The two were in their bedroom, and Apfeltzweig struggled against Plaintiff, "flailing" while Plaintiff put his hand over her mouth.  (Apfeltzweig Dep. 91.)  Plaintiff told her to "be quiet," and put his hands over her mouth twice, holding his hand on her mouth for two to three minutes each time.  (Apfeltzweig Dep. 172-73.)  Apfeltzweig denies that Plaintiff hit her, denies hitting her head, and does not recall yelling "stop hitting me" or anything like that.  (Apfeltzweig Dep. 94.)  She also denies that Plaintiff ever shoved her, describing their altercation as "wrestling around on the floor," without Plaintiff ever pinning her down.  (Apfeltzweig Dep. 94-95.)  Although she denies hitting her head, she testified that her face might have been on the carpet at some point because they were lying down on the ground while Plaintiff was holding her and she was struggling.  (Apfeltzweig Dep. 97.)  While she was struggling, Apfeltzweig was sporadically kicking the ground out of frustration.  (Apfeltzweig Dep. 99, 104.)  Apfeltzweig estimates the argument lasted about 45 minutes.  (Apfeltzweig Dep. 100.)

Plaintiff denies raising his voice, and testified that he never hit, pushed or threw Apfeltzweig into any furniture, and did not throw anything at her.  (Chavez Dep. 181-82, 194.)  He states that he never laid his hands on her, and that during the argument Apfeltzweig "[was] kind of stomping around the apartment and yelling at [him]."  (Chavez Dep. 180-81.)  He estimates that the two argued for 15-20 minutes or longer.  (Chavez Dep. 180.)

According to Troche, after listening on the landing outside the apartment for at least ten seconds, Troche instructed one of the officers to radio to their sergeants or supervisors that they were going to do a "knock and notice" before kicking in the door.  (Troche Dep. 65-67.)  Troche knocked on the door and announced, "Hayward Police."  He states that after the officers waited 10-15 seconds, he kicked the door in, simultaneously pulling out his firearm.  By contrast, Plaintiff testified that he did not hear a knock on the door, but instead heard "Hayward PD" before the door

3

1  was kicked in a "split second" later. (Chavez Dep. 156.) Apfeltzweig testified that she and
2  Plaintiff were moving towards the front door to open it for the police but only got a few steps
3  before the officers were inside, and that the police came in "one second" after yelling "Hayward
4  PD." (Apfeltzweig Dep. 114, 117-18, 120.)

5        The parties sharply dispute what happened after the officers entered the apartment.
6  Plaintiff heard the officers yell at him to come out with his hands up. According to Plaintiff, he
7  responded calmly, saying "I'm coming out with my hands up." As he rounded the corner, he had
8  his hands open, up over his head, and saw the officers with their guns pointed at him. (Chavez
9  Dep. 158.) Plaintiff states that he was "moving intentionally slow" and "was walking in a manner
10 that was not aggressive." (Chavez Dep. 200-201.) He denies that he was angry; instead, he claims
11 he "was in shock." (Chavez Dep. 194.) The officers told him to get on the floor, and he
12 responded "I'm getting on the floor," and got down to his knees. (Chavez Dep. 156.) Plaintiff
13 testified that the officers "almost instantaneously" "rushed me, slammed me down on the ground,
14 [and] started kicking me." (Chavez Dep. 156, 160.) His hands were pulled behind his back and
15 his head was "slammed into the ground." (Chavez Dep. 160.)

16       Plaintiff states that he was kicked on both sides of his body three to four times. He saw the
17 first kick to his face, then closed his eyes, turned to the side, and got kicked on his other side.
18 (Chavez Dep. 164, 167-68.) When asked if it was possible if he had been punched instead of
19 kicked, Plaintiff testified that "it felt like a boot" and that he saw the first kick to his face. (Chavez
20 Dep. 167.) Plaintiff, who stands 5'9" and weighs 140 pounds, denies kicking the officers and
21 states that he never tucked his hands under his body. He also asserts that he never tried to escape
22 from the officers or tried to pivot from under them because he could not move. (Chavez Dep. 144,
23 169-70.) He testified, "[t]hese guys are like three times my size . . . I was going nowhere."
24 (Chavez Dep. 169.) At some point, he felt a baton strike to his leg. He heard Apfeltzweig scream
25 at the officers to stop two or three times. The officers told Plaintiff to stop resisting, and he
26 replied "Sir, you have both of my arms, I can't move, I'm not resisting." (Chavez Dep. 228.) The
27 officers told him again to stop resisting, and then one of the officers took Plaintiff's left arm from
28 his back, extended it to Plaintiff's side, then "put a knee on Plaintiff's upper arm and bent [his]

4

1    elbow against the joint until it snapped." (Chavez Dep. 171-72.) Plaintiff felt his arm pop and
2    said twice, "I think you broke my arm." The officers handcuffed him and "yanked [him] off the
3    floor" and walked him downstairs, where they "threw" him in an ambulance. (Chavez Dep. 173,
4    176.)

5          Apfeltzweig corroborates Plaintiff's account that he complied with the officers'
6    commands. She testified that the officers came into the apartment, moving into the living room,
7    and she saw Plaintiff with his hands up. According to Apfeltzweig, the officers yelled at him to
8    get on the ground and Plaintiff immediately dropped to his knees with his hands up. The officers
9    then "just swarmed him" and pushed his face onto the ground. (Apfeltzweig Dep. 123, 125, 127.)
10   She saw one officer "step on him" with his boot to push him further onto the ground, and saw
11   Plaintiff with his hands behind his back while he was on his stomach. Then two of the officers
12   blocked her view of Plaintiff. (Apfeltzweig Dep. 125, 128-29.) She repeatedly yelled "stop it"
13   because the officers were being "really rough" with Plaintiff, and according to Apfeltzweig, she
14   did not see Plaintiff struggling with them. (Apfeltzweig Dep. 127.) She also testified that Plaintiff
15   was not kicking at them and that he "absolutely" calmly complied with the officers' directions.
16   (Apfeltzweig Dep. 127-28.) At some point, McLeod came over to her and pulled her away from
17   the altercation, guiding her away from Plaintiff. She did not witness his arm break.

18         In contrast, the officers contend that Plaintiff was not compliant and refused to follow their
19   instructions. Troche testified that when he went through the doorway into the apartment, he called
20   out to the occupants to come out with their hands up. He saw Plaintiff with his hands out to his
21   side, with his hands "[n]ot all the way closed. Not all the way open." (Troche Dep. 68, 70-71.)
22   Troche did not see any weapons on Plaintiff. He ordered Plaintiff to get on the ground, but
23   Plaintiff did not comply and instead "advance[d]" on Troche as Troche holstered his weapon.
24   (Troche Dep. 72.) According to Miller, Plaintiff said "what?" aggressively and then walked
25   towards Troche. (Miller Dep. 72.) Plaintiff quickly closed the distance between himself and
26   Troche, going from 15 feet to within two feet of the officer. Troche believed Plaintiff was going
27   to assault him because he didn't follow orders to get on the ground, continued to advance on
28   Troche, and "made a statement like, what the fuck." Troche then grabbed Plaintiff and pushed

him to the ground to keep him away. Troche, who is six feet one and weighed 230 pounds at the time, grabbed Plaintiff by the shoulder area and pushed him forward to the ground on his stomach. He then sprawled on Plaintiff with his weight on Plaintiff's right shoulder, trying to get Plaintiff's right arm out so he could handcuff Plaintiff.

Although Miller did not observe Plaintiff voluntarily go to his knees, he did not see how Plaintiff ended up on the ground with Troche. Miller testified that he saw Plaintiff kicking his legs, so he rushed over to assist Troche in handcuffing Plaintiff. According to Miller, Plaintiff was noncompliant and Miller told him to stop resisting; Plaintiff was "fighting" to keep his hands from Troche and Miller's control and the officers were unable to handcuff him. Miller is six feet tall and weighed 210 or 220 pounds on the date of the incident.

After ordering Plaintiff several times to give him his hands, Troche states that Plaintiff was still "actively fighting us trying to turn over onto his back." (Troche Dep. 82.) Troche delivered a strike to Plaintiff's his rib cage and a hammer fist to Plaintiff's face because Plaintiff had "balled up a fist and pulled his arm away" from Troche. (Troche Dep. 82-83.) Troche states that Plaintiff was trying to kick him, although Plaintiff was never able to land a blow.

McLeod testified that he saw Plaintiff struggling with Troche as soon as he entered the room, and observed Plaintiff's hands clenched, with Troche's uniform bunched up in his fists. McLeod approached Apfeltzweig, told her to stay where she was, and asked if there was anyone else in the apartment. He then saw that Plaintiff was still fighting with the officers and went over to where they were struggling on the ground. Plaintiff kicked McLeod, who then struck Plaintiff three times on his lower legs with his baton. McLeod is 5'11" and weighed 190 pounds at the time.

Miller testified that in the process of trying to gain control of Plaintiff's left arm, he "squeezed [Plaintiff's] arm with his inner thigh/knee area" so that his knees made contact with Plaintiff's arm. He put Plaintiff's left arm "into a prone control hold," with Plaintiff "laying in a prone position and [Miller] gaining positive control of his arm using an arm bar." (Miller Dep. 89-90.) While trying to move Plaintiff's arm to the small of his back, and while yelling "stop resisting," Miller heard a "pop" sound. (Miller Dep. 110-11.) Plaintiff then said "I think you

6

broke my arm." (Miller Dep. 112.) Miller denies breaking Plaintiff's arm; according to Miller, Plaintiff "drove his hips forward, which lunged his body weight away from the control hold, as [Miller] transitioned from having his arm between [Miller's] legs," and this movement caused his arm to break. (Miller Dep. 113-14.) Plaintiff's body then immediately went from rigid to relaxed, and he put his right hand behind his back and his forehead down on the carpet.

The entire incident was extremely brief; only 78 seconds had elapsed from the moment the officers kicked the door to the point Plaintiff was detained. Plaintiff was subsequently transported to the hospital for treatment. He suffered injuries on both sides of his face and neck, legs, and left elbow. He was diagnosed with a left elbow closed supracondylar fracture. Plaintiff underwent arm surgery on January 20, 2013 and was discharged on January 22, 2013. None of the officers were injured in the altercation. Apfeltzweig was not injured and did not require medical attention. Plaintiff was arrested for violation of California Penal Code section 273.5, willful infliction of corporal injury on a cohabitant, which is a felony. Plaintiff was ultimately charged with violation of California Penal Code section 148(a)(1) for resisting an officer, a misdemeanor. The charge was later dismissed.

**B.  Procedural History**

Plaintiff filed his complaint on January 31, 2014 against the City of Hayward, Chief Urban in her individual and official capacities, Troche, McLeod, and Miller. Plaintiff alleged the following causes of action: 1) Section 1983 claim for excessive force against the Defendant Officers; 2) Section 1983 claim for supervisory liability against Chief Urban based on her alleged failure to properly train the Defendant Officers; 3) Section 1983 claim against the City and Chief Urban under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978); 4) assault against the Defendant Officers[2]; 5) battery against the Defendant Officers; 6) false arrest/false imprisonment against the Defendant Officers; 7) intentional infliction of emotional distress against the Defendant Officers; 8) negligence against the Defendant Officers; and 9)

---

[2] In his complaint, Plaintiff alleges his claims for assault, battery, false arrest/false imprisonment, intentional infliction of emotional distress, negligence, and Bane Act against "all Defendants." At the hearing, he clarified that he brings these six claims against the Defendant Officers only.

7

1 violation of California's Bane Act, California Civil Code section 52.1 against the Defendant
2 Officers. On May 23, 2014, Plaintiff dismissed his claims against Chief Urban in her official
3 capacity. [*See* Docket No. 28.]

## II. Legal Standards

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott*, 550 U.S. at 380.

## III. Analysis

### A.   Claims No Longer at Issue

Plaintiff concedes his second cause of action for supervisory liability against Chief Urban for alleged failure to train, as well as his sixth claim for false arrest/false imprisonment.

1  Accordingly, those claims are dismissed with prejudice.

2  **B.    Excessive Force and Qualified Immunity**

3  The Defendant Officers move for summary judgment on Plaintiff's excessive force claim on the grounds that each of them used reasonable force. In the alternative, they argue that they are entitled to qualified immunity.

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (citations and internal quotation marks omitted). Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary

9

judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted).

The Defendant Officers argue that they are entitled to summary judgment on Plaintiff's excessive force claim because their actions were objectively reasonable under the totality of the circumstances. Defendants argue that they used reasonable force in light of the following facts: 1) Plaintiff's crime – domestic violence – was moderately severe and the officers could hear the abuse taking place inside the apartment; 2) the officers were concerned about their own safety based on the nature of the 911 call and their own observations outside the apartment; and 3) Plaintiff actively resisted arrest. According to Defendants, Plaintiff manifested his resistance by not answering the door, failing to comply with Troche's command to get on the ground, physically assaulting Troche, hiding his hands under his body, kicking at the officers, and trying to escape.

Defendants assert that the quantum of force admittedly used by each officer was reasonable in light of these circumstances. According to Troche, he pulled Plaintiff down to the ground and pushed him on his stomach, sprawling on Plaintiff's shoulder to control his arm. Troche states that he also struck Plaintiff once in his rib cage and once in his face when trying to gain control over him. McLeod states that he struck Plaintiff three times with his baton on his lower legs. Miller states he applied an "arm bar" to Plaintiff's left arm in the process of handcuffing, and asserts that Plaintiff's own movements in "lunging his body opposite of the way the control hold was applied" resulted in his arm breaking. (*See* Miller Dep. 113-14.) In other words, Miller contends that Plaintiff caused his own arm to break while Miller was attempting to handcuff him.

Notably, Defendants do not address Plaintiff's testimony contradicting their version of events. Plaintiff disputes *nearly every factual assertion* Defendants make about what happened in the apartment both before and after the officers entered. Plaintiff and Apfeltzweig's accounts of their argument are not entirely consistent. However, both testified that the officers broke down the door only a moment after they announced their presence, giving them little or no chance to answer the door. Although Troche states that Plaintiff was "advancing" on him, Apfeltzweig testified that

10

Plaintiff was simply moving toward the door to answer it. Plaintiff contends that he complied with all of the officers' commands, including putting his hands up and getting on his knees to go to the floor as soon as he was ordered to do so. He denies moving in an aggressive manner, stating he was moving "intentionally slow[ly]." (Chavez Dep. 200.) Plaintiff states that the officers had both of his hands pulled behind his back "almost instantaneously" and unequivocally denies kicking the officers, tucking his hands underneath his body, trying to pivot out from under them, or trying to escape in any way. He points out the difference in his size and the sizes of the officers, each of whom was taller and between 50 and 90 pounds heavier than Plaintiff. He denies resisting the officers in any way, and testified that he told the officers that he was not resisting because he could not move. According to Plaintiff, even though he was not resisting, Miller slid Plaintiff's left arm from his back, extended it to his side, and intentionally broke it. Plaintiff also alleges that the officers kicked him, although his eyes were closed and he is unable to identify which officers delivered the kicks.

Defendants also do not address Apfeltzweig's corroborating testimony that Plaintiff calmly complied with instructions, putting his hands up and dropping to his knees. Although she had only a partial view of Plaintiff due to the location of the officers, she strenuously denies that Plaintiff was kicking the officers.

The excessive force inquiry asks whether the officers' actions were objectively reasonable in light of the circumstances confronting them. *See Graham*, 490 U.S. at 396. Viewing the evidence in the light most favorable to Plaintiff, the court finds that a reasonable jury could conclude that each officer's use of force toward Plaintiff was not reasonable. If a juror accepts Plaintiff's testimony that he was fully compliant with the officers' directions, the juror could conclude that *any* use of force in the situation was unnecessary and thus excessive. Accordingly, given the numerous factual disputes, summary judgment as to Plaintiff's excessive force claim against each officer must be denied.

The Defendant Officers also move for summary judgment on the grounds that they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established."[1] *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (internal quotation marks omitted) (citing *Saucier*, 533 U.S. at 202). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S. at 202.

The Ninth Circuit has made clear that "when [qualified immunity] depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury." *Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008) (noting that where "historical facts material to the qualified immunity determination are in dispute," a jury must decide those facts). "The determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can be decided on summary judgment only if the material facts are undisputed." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

Given the factual disputes regarding Plaintiff's actions immediately before and during his struggle with the Defendant Officers, the court denies summary judgment on qualified immunity. *See Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (unresolved

---

[1] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that a court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

1    issues of fact regarding reasonableness of use of force "are also material to a proper determination
2    of the reasonableness of the officers' belief in the legality of their actions.").

### C. *Monell* Claim

Plaintiff's third claim is for municipal liability against the City for its policy, practice, and custom of violating the Fourth Amendment through the use of unreasonable, unjustified, and/or excessive force. (Compl. ¶ 44.) In his opposition, Plaintiff clarifies that his claim is based upon Chief Urban's ratification of the Defendant Officers' use of excessive force and the City's alleged failure to train Defendant Miller regarding his use of force. (*See* Pl.'s Opp'n 22-23.)

A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, ---U.S.---,---, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell*, 436 U.S. at 692). However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement 'was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality,' and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 131 S. Ct. at 1359 (citations omitted). Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).

"A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). However, an isolated constitutional violation may be sufficient to establish a municipal policy in the following three situations: 1) "when the person causing the violation has 'final policymaking authority,'" *see id*. at 1235; 2) when "the final policymaker 'ratified' a subordinate's actions," *see id*. at 1238; and 3)

13

when "the final policymaker acted with deliberate indifference to the subordinate's constitutional violations." *See id*. at 1240.

### 1. Ratification

Plaintiff's *Monell* claim is based in part on the theory that Chief of Police Diane Urban "ratified" the Defendant Officers' use of excessive force by approving the results of the ensuing Internal Affairs investigation which exonerated the Defendant Officers. Following Plaintiff's arrest, HPD Sergeant Jeffrey Snell investigated Plaintiff's allegations of excessive force and false arrest. Snell determined that the Defendant Officers had not violated any HPD policies. He submitted his report to his supervisor for approval; the report subsequently was forwarded to Chief Urban for review. Chief Urban concurred, thereby exonerating the Defendant Officers. Plaintiff argues that Chief Urban's review and concurrence constitutes ratification of the alleged constitutional violations.

Generally, ratification is a question of fact for the jury, but "a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Christie*, 176 F.3d at 1238-39. "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Id*. at 1239 (quoting *City of St. Louis v. Paprotnik*, 485 U.S. 112, 127 (1988)). Here, there is no evidence that Chief Urban knew of the Defendant Officers' actions "before the alleged constitutional violations ceased." *See Christie*, 176 F.3d at 1239. In other words, Chief Urban's exoneration of the Defendant Officers took place after the alleged use of excessive force; therefore, her action did not result in or cause the violation of Plaintiff's constitutional right to be free from excessive force. *See, e.g., Christie*, 176 F.3d at 1239-40 (finding triable issue of fact as to whether prosecutor ratified actions of deputy prosecutor's selective prosecution of plaintiff where there was evidence prosecutor knew and approved of deputy's actions before criminal case was ultimately dismissed and alleged constitutional violation ceased); *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1099 (N.D. Cal. 2005) (noting that because "[t]he violation occurred prior to the alleged indifference," plaintiff had not established dispute of fact regarding ratification based on Chief of Police's approval of allegedly deficient internal affairs investigation).

*Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991), cited by Plaintiff, does not support his position. There, plaintiffs presented testimony by an expert who conducted a two-year study of citizen complaints filed with the Los Angeles Police Department ("LAPD") and concluded that "it was 'almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen.'" *Id*. at 647. The court found that a jury could reasonably conclude that the police department's treatment of plaintiff's citizen's complaint regarding excessive force and unreasonable search corroborated the theory that "the LAPD's disciplinary and complaint processes, executed by policy or custom," contributed to a pattern and practice of abusive police conduct. *Id*. The court also held that a jury could find a policy or custom "of resorting to the use of excessive force . . . from the failure of [the police chief] to take any remedial steps after the violations." *Id*. As one court in this district has noted, *Larez* did not "establish ratification by deliberate indifference towards a single after-the-fact investigation." *Cole*, 387 F. Supp. 2d at 1101; *see also Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003) (noting "[t]he Ninth Circuit appears to require something more than a failure to reprimand to establish a municipal policy or ratification," discussing *Larez*). In this case, there is no evidence of a custom or policy of using excessive force for which Chief Urban failed to take remedial steps, nor is there evidence that she created or maintained a policy in which investigations of citizen complaints were cursory or meaningless. Therefore, the court grants Defendants' motion for summary judgment to the extent Plaintiff's *Monell* claim is based on a ratification theory.

### 2. Failure to Train

Under limited circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 131 S.Ct. at 1359. However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. In order to establish liability under this theory, the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citing *Canton v. Harris*, 489 U.S. 378, 388 (1989)). This "stringent standard of fault" requires proof that "policymakers

15

are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 131 S.Ct. at 1360; *see also Canton*, 489 U.S. at 389 ("[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). The training deficiency must be the "functional equivalent of a decision by the city itself to violate the Constitution." *Id.* "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *Canton*, 489 U.S. at 39).

In order to establish section 1983 municipal liability based on a failure to train, a plaintiff must show: 1) deprivation of a constitutional right; 2) a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons with whom [the police] are likely to come into contact"; and 3) that his constitutional injury would have been avoided had the municipality properly trained the officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (quoting *Canton*, 489 U.S. at 388-89) (first alteration in original).[3]

Here, Plaintiff's evidence in support of his "failure to train" claim focuses solely on Miller. Plaintiff argues that evidence of similar incidents regarding Miller's use of force establishes that the City had actual or constructive notice of the inadequacy of its policies and training with respect to Miller, making the need for additional training foreseeable and obvious. *See Connick*, 131 S. Ct. at 1360 ("A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train." (citing *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997))). Plaintiff presents evidence that in

---

[3] In their reply, Defendants raise the technical argument that Plaintiff pleaded a "failure to train" claim against Chief Urban in her personal capacity, a claim which he now concedes. Defendants thus assert that the *Monell* "failure to train" claim fails because it was never clearly pleaded. Having examined Plaintiff's complaint, the court finds that Plaintiff did not specifically bring a *Monell* claim based on the City's failure to provide training. (*See* Compl. ¶ 44.) However, the City identifies no prejudice resulting from Plaintiff's insufficient pleading. The court will therefore consider the substance of this claim.

16

1   November 2011, HPD performed a review of an "Early Intervention and Identification System"
2   ("EIIS") alert regarding Miller, which had been triggered as a result of two citizen complaints and
3   seven reportable use of force incidents involving Miller within a certain period of time. Plaintiff
4   argues that HPD took no corrective action in response to this review, which "emboldened" Miller
5   and "precipitat[ed] an increased level of force" by him. (Pl.'s Opp'n 23.)

6   Plaintiff also presents a declaration by Laprell Washington, in which Washington describes
7   an August 2012 confrontation with Miller following a verbal argument between Washington and
8   his girlfriend in a public park. Washington states that without provocation, Miller dragged him
9   into the street and kicked him 15-20 times, yelling at Washington to "Quit resisting!" even though
10  Washington was not resisting. Plaintiff argues that this encounter was "strikingly similar" to his
11  own arrest, and demonstrates the City's deliberate indifference to the residents of the City,
12  including Plaintiff. Plaintiff offers no evidence of alleged shortcomings in training with respect
13  to Troche, McLeod, or any other HPD officers.

14  In the Ninth Circuit, evidence of a municipality's failure to train a single officer is
15  insufficient as a matter of law to establish a deliberate policy for purposes of *Monell* liability.
16  *Blankenhorn*, 485 F.3d at 484. In *Blankenhorn*, the court explained that "absent evidence of a
17  'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be
18  classified as negligence on the part of the municipal defendant—a much lower standard of fault
19  than deliberate indifference.'" *Id*. at 484-85 (quoting *Alexander v. City & Cnty. of San Francisco*,
20  29 F.3d 1355, 1367 (9th Cir. 1994). Here, because Plaintiff has limited his proof to the City's
21  failure to train Miller, he fails to meet his burden.

22  Accordingly, Plaintiff has failed to raise a genuine issue of fact regarding his *Monell* claim
23  to the extent it is based on the City's failure to provide adequate training. Summary judgment is
24  therefore granted.

25  **D.    Assault & Battery**

26  Plaintiff's fourth and fifth claims are for assault and battery. The Defendant Officers move
27  for summary judgment on the grounds that their conduct was objectively reasonable for the
28  reasons described above in connection with the excessive force claim. The law governing a state

17

1  law claim for battery is the same as that used to analyze a claim for excessive force under the
2  Fourth Amendment. *See Sorgen v. City and Cnty. of San Francisco*, No. C 05-03172 TEH, 2006
3  WL 2583683, at *9 (N.D. Cal. Sept. 7, 2006) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th
4  1269, 1274-75 (1998)).

5        The elements of a cause of action for assault are "(1) defendant acted with intent to cause
6  harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2)
7  plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it
8  reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did
9  not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a
10 substantial factor in causing plaintiff's harm." *Yun Hee So v. Shin*, 212 Cal. App. 4th 652, 668-69
11 (2013).

12       Given the disputes of fact regarding the Defendant Officers' use of force, the court denies
13 summary judgment as to Plaintiff's assault and battery claims.

14 **E.  Intentional Infliction of Emotional Distress**

15       In order to establish a claim for intentional infliction of emotional distress, Plaintiff must
16 show "(1) extreme and outrageous conduct by [Defendants] with the intention of causing, or
17 reckless disregard of the probability of causing, emotional distress"; (2) that Plaintiff "suffer[ed]
18 severe or extreme emotional distress; and (3) actual and proximate causation of the emotional
19 distress by [Defendants'] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations
20 and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to
21 exceed all bounds of that usually tolerated in a civilized community." *Id*. at 1051 (citations and
22 quotation marks omitted). Behavior "may be considered outrageous if a defendant . . . abuses a
23 relation or position which gives him power to damage the plaintiff's interest." *Cole v. Fair Oaks
24 Fire Dept.*, 43 Cal. 3d 148, 155 n.7 (1987).

25       The Defendant Officers argue that they are entitled to summary judgment because their
26 conduct was reasonable, and therefore cannot have been extreme and outrageous. As there are
27 triable issues of fact regarding Plaintiff's actions in the moments leading up to his arrest, there is a
28 genuine dispute about whether their conduct was extreme and outrageous. *See Blankenhorn v.*

18

*City of Orange*, 485 F.3d 463, 487 n.17 (9th Cir. 2007) (reversing grant of summary judgment on intentional infliction of emotional distress claim premised on alleged use of excessive force where there were disputes of fact regarding whether the use of force was lawful).

Defendants also argue that there is no evidence that Plaintiff suffered extreme or severe emotional distress sufficient to maintain a claim for intentional infliction of emotional distress.[4] Under California law, "[s]evere emotional distress means 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'" *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) (quotation marks and citation omitted). The California Supreme Court held that a plaintiff's assertions of "discomfort, worry, anxiety, upset stomach, concern, and agitation" do not establish severe or extreme emotional distress required to maintain such a claim. *See id*.

Plaintiff testified that after the incident, he experienced anxiety living in Hayward. He and Apfeltzweig moved to another city because he did not feel safe. Plaintiff has not sought treatment for his anxiety, although a physician recently recommended psychotherapy. Plaintiff testified that he has not sought treatment in part because he does not have medical insurance. However, he also testified that he does not see his anxiety as "a bad thing," but instead views it as "motivating" because it helps him "get things done." (Chavez Dep. 237-38.) Plaintiff does not believe he exhibits any signs of depression or anxiety. Taken together, these allegations fall short of what the court required in *Hughes*. Plaintiff's evidence of his emotional reaction to his arrest does not demonstrate severe or extreme emotional distress of lasting or enduring quality. Therefore, the court grants summary judgment on Plaintiff's intentional infliction of emotional distress claim.

**F. Negligence**

Defendants next move for summary judgment on Plaintiff's negligence claim based on the use of force. In order to establish a negligence claim, Plaintiff must establish "(1) a legal duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach."

---

[4] Defendants raised this argument for the first time in their reply brief. At the hearing, Plaintiff provided evidence and argument on this point. The court offered Plaintiff the opportunity to provide further briefing on his intentional infliction of emotional distress claim, which Plaintiff's counsel declined.

19

*Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cnty. of San Mateo*, 12 Cal.4th 913, 917 (1996)). Under California law, "police officers have a duty not to use excessive force." *Id.* (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1101 (2004)). As the court denies summary judgment on the claim for excessive force, summary judgment on Plaintiff's negligence claim is also denied.

### G. California Civil Code section 52.1 (Bane Act)

Finally, the Defendant Officers move for summary judgment on Plaintiff's ninth claim for violation of California Civil Code section 52.1, also known as the Bane Act. The Bane Act gives rise to a claim where "a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a). Plaintiff's Bane Act claim is based upon the Defendant Officers' alleged use of excessive force.

Defendants move for summary judgment claim solely on the grounds that the underlying excessive force claim lacks merit. *See Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170-71 (9th Cir. 1996) ("because there is no federal constitutional violation and no conduct specified which constitutes a state constitutional violation, there is no conduct upon which to base a claim for liability under 52.1."). As the court denies summary judgment on the underlying excessive force claim, summary judgment on Plaintiff's Bane Act claim is denied.

### IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: June 19, 2015



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge

20